UNITED STATES DISTRICT COURT  ELECTRONIC PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

MANUEL DIAZ,

                       Plaintiff,                       MEMORANDUM
    -against-                                                       AND ORDER
                                                                               08-CV-5006 (JG)

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                       Defendant.
-------------------------------------------------------x

A P P E A R A N C E S :

    HERBERT S. FORSMITH
        26 Broadway, 17th Floor
        New York, NY 10004
        *Attorney for Plaintiff*

    BENTON J. CAMPBELL
        United States Attorney
        Eastern District of New York
        271 Cadman Plaza East
        Brooklyn, NY 11201
    By:    Arthur Swerdloff, Special Assistant
        United States Attorney
        *Attorneys for Defendant*

JOHN GLEESON, United States District Judge:

        Plaintiff Manuel Diaz was a construction worker his entire life until the end of August in 2006, when, at age 53, he stopped working. On January 6, 2007, he filed an application for Social Security Disability Insurance Benefits and Supplemental Security Income Benefits. He alleged that he stopped working because he was disabled due to right kidney removal, a left kidney impairment described variously as nephritic syndrome[1] and nephrotic

---

[1] Nephritic syndrome (glomerulonephritis) is a disorder of glomeruli ("clusters of microscopic blood vessels in the kidneys") that can cause edema, hypertension, abdominal pain, and other symptoms. Merck

syndrome,[2] and the side effects of medication taken to treat his kidney problems. After filing his claim, which alleged an onset date of September 10, 2006, Diaz developed avascular necrosis in his right hip.[3] Diaz's application was denied initially and on reconsideration, and he requested a hearing before an administrative law judge ("ALJ"). Diaz appeared with an attorney at the July 8, 2008 hearing before ALJ Jeffrey Jordan. On July 23, 2008, the ALJ concluded that Diaz was not disabled within the meaning of the Social Security Act ("the Act") between September 10, 2006 and December 26, 2007, when he turned 55 and became disabled based upon medical-vocational factors. The Appeals Council denied Diaz's request for review on October 16, 2008. The adverse decision thus became the decision of the Commissioner of Social Security ("Commissioner").

Diaz seeks review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Based upon the record before the Commissioner, the parties have cross-moved for judgment on the pleadings. I heard oral argument on August 21, 2009.

Because the ALJ failed to apply correct legal standards in evaluating the evidence, and because his finding regarding Diaz's residual functional capacity ("RFC") during the relevant period is not supported by substantial evidence, I grant the plaintiff's cross-motion for judgment on the pleadings, deny the defendant's motion, and remand the case for further proceedings.

---

Manuals Online Medical Library ("Merck Manual"), www.merck.com/mmhe/index.html.
[2] Nephrotic syndrome is also a disorder of the glomeruli that can cause edema and abdominal pain. Merck Manual.
[3] Avascular necrosis of bone is also known as osteonecrosis and is "a condition in which there is death of a localized area of bone." Merck Manual. It causes pain, limited range of motion in the affected joint, and, "when the leg is affected, a limp." *Id.* It may be caused by an injury or occur spontaneously, and is diagnosed based on symptoms and the results of x-rays and magnetic resonance imaging ("MRI"). *Id.*

2

BACKGROUND

Manuel Diaz was born on December 27, 1952. At the July 8, 2008 hearing, Diaz testified that his right kidney was removed in 1998. In 1999, he was diagnosed with a "syndrome" in his left kidney, and took steroids for almost two years for his condition. Tr. 31. As a result of the steroids, he experienced "muscle pain" and significant weight gain. *Id.* Prior to this time, he had worked for various construction companies, but he then "went on his own," because he "couldn't handle" working for a company where he would be "expected to do a lot of work [he] couldn't do." Tr. 31. Diaz also stated that his doctors discovered "a disease in [his] right hip," Tr. 32, in April of 2008. This disease caused "very sharp" pain in his hip. Tr. 33. Diaz treated the pain with Tylenol, which helped "a little bit." Tr. 34.

Diaz stopped taking steroids for his kidney condition in December 2007. He saw Dr. Joseph Lieber for his renal condition approximately every two months. He worked as a construction worker until August 2006, until the pain from his ailments and the side effects of his medicine rendered him unable to continue working.

In a statement dated February 5, 2007, Diaz states that his daily activities consist of watching television and reading. He also states that he can drive and go out alone, and can walk twenty blocks without resting. He cannot, however, do house or yard work or engage in sports because of pain in his back, knees, and abdomen.

Diaz claims that the "stabbing" pain he feels in his knees, back, neck, abdomen, and left hamstring started in 1999 and steadily worsened. Tr. 119. He experiences this pain for a few hours every day, and it is aggravated if he tries "to work hard," or stands in the same

3

position while, for example, washing dishes. Tr. 120. He takes Tylenol for the pain, which "helps a little bit." Tr. 120. He also lies down to ease his pain.

Dr. Dyana Aldea performed a consultative examination of Diaz on February 27, 2007. Diaz presented with a history of abdominal pain that began in 1998, when Diaz was diagnosed with cancer of the right kidney, which was surgically removed at Elmhurst Hospital in Queens. He developed nephrotic syndrome in his left kidney in 1999 "and since that time has had increasing back pain and abdominal pain." Tr. 149. He also complained of neck pain radiating to the lower back. The pain occurs spontaneously several times daily for at least two hours, with intensity from a 5/10 to 8/10. It is aggravated by prolonged standing, walking, squatting, and climbing, and relieved with rest and medication. Diaz also complained of left knee pain, similarly aggravated and relieved, caused by arthritis diagnosed in 2005. According to Aldea, Diaz stopped working as a construction worker in September 2006 "secondary to kidney problems and abdominal pain." Tr. 149.

Dr. Aldea noted that Diaz could clean and dress himself but could not assist his wife with cooking, shopping, cleaning or laundry because of "lower abdominal pain and kidney problems." Tr. 150. When examined, Diaz did not appear to be in acute distress, had a normal stance, used no assistive devices, and was able to change for the exam and get on and off the exam table without help. However, his gait was mildly antalgic, he limped with his left foot, and his squat was "only 50% of full, complaining of left knee pain." Tr. 150.

Aldea also noted that Diaz's abdomen was distended and tender to palpitation "over the right lower quadrant." Tr. 151. He had a limited range of motion in his left knee, and

his strength across the left knee "could not be well assessed secondary to pain." *Id*. His left knee was also swollen.

> Aldea gave the following medical source statement ("MSS"):
>
> Secondary to kidney problems, abdominal pain, and back pain, the claimant has moderate limitations for lifting, bending, squatting, and prolonged climbing. No limitations for standing or ambulation. No limitations with the upper extremities for fine and gross motor activities.

Tr. 154.

Dr. Joseph Lieber, who treated Diaz for his kidney problems for more than 11 years, completed a medical source statement of Diaz's ability to do work-related activities on June 6, 2008. Tr. 207. In it, he states that during an eight-hour work day, Diaz could occasionally and frequently lift or carry less than 10 pounds, stand or walk less than two hours, and sit for less than six hours. Tr. 207-08. His ability to push and pull with his lower extremities was also limited. When asked what findings supported these conclusions, Lieber stated that Diaz has "recently diagnosed" avascular necrosis of his right hip, which caused "severe pain with limp." Tr. 208. He also noted that Diaz had a history of renal cell cancer and "nephritic[4] syndrome which had required steroids," and that "[a]vascular necrosis limits ability to stand, walk and push." *Id.* Lieber also stated that Diaz should never engage in any climbing, balancing, kneeling, crouching, crawling, or stooping during the workday, because his necrosis will "greatly limit" mobility at the hip level and "pain radiates to the upper knee as well." *Id.* He also stated that Diaz's exposure to machinery and heights should be limited because of his necrosis. Tr. 210.

---

[4] It is unclear whether Lieber uses the word "nephritic" or "nephrotic."

Dr. Lieber filled out a similar form on July 1, 2008. It differs from the June 6, 2008 form in four ways. First, Lieber states that Diaz may occasionally lift "10 pounds," rather than "less than 10 pounds." Tr. 211. Second, when asked for the findings that support his conclusions regarding sitting, standing, and the like, he states "severe pain due to hip necrosis" and "[p]atient has not been able to do above due to avascular necrosis of hip [illegible] to chronic corticosteroid use. Further he has complicated [illegible] including severe edema in past due to kidney disease and kidney cancer. He is currently non weight bearing. Prior, he suffered from severe edema due to kidney disease." Tr. 212. Third, he states that Diaz may "occasionally"[5] engage in balancing, crouching, and stooping, and notes that "[d]ue to severe hip pain patient should be non[-]weight bearing." *Id.* Fourth, he notes that Diaz's exposure to heights or machinery is not limited.

Dr. Maryanne Cucchiarelli, D.O., filled out a similar form on June 16, 2008. She states that Diaz can occasionally lift or carry 10 pounds, but cannot do any frequent lifting or carrying. She includes a handwritten explanation that I cannot decipher. Cucchiarelli states that Diaz can only stand or walk for less than two hours in a day, and her notation following this question reads: "cannot walk > 3 blocks, even with crutches . . . [illegible] required by orthopedics to use crutches to decrease load on R hip." Tr. 215. She states that he must periodically alternate sitting and standing to relieve pain or discomfort and that his ability to push and pull with both upper and lower extremities is limited. Her explanatory notation reads: "Patient with avascular necrosis R hip (may be starting in left as well) cannot walk > 3 blocks even with crutches is required [illegible]." Tr. 216. She also states that Diaz can never engage

---

[5] On the form, "[o]ccasionally means occurring from very little up to one-third of an 8-hour workday." Tr. 212.

in climbing, balancing, kneeling, crouching, crawling, or stooping, explaining that "avascular necrosis R hip (may be starting in left as well), [these activities] would hurt him too much and he has severe pain even without attempting this." Tr. 216. She also states that Diaz is "not allowed to reach overhead if [he] has to reach high." Tr. 217. Finally, she states that Diaz's exposure to temperature extremes, humidity/wetness, and hazards such as machinery and heights should be limited because "[illegible] cold, warming affects joints -- hip [illegible] would make pain worse." Tr. 218.

The ALJ found that Diaz had not engaged in substantial activity since September 10, 2006, and that he had three severe impairments -- arthritis, avascular necrosis of the right hip, and status-post-right nephrectomy. Tr. 11. Relying heavily on the statement of Dr. Aldea, and discounting the statements of Drs. Lieber and Cucchiarelli as inconsistent with the record, unsupported by clinical findings, and internally inconsistent with regard to Dr. Lieber's statements, he found that Diaz retained the RFC to perform a less than a full range of light work. He could lift or carry 10 pounds frequently and 20 pounds occasionally and sit for at least six hours and stand or walk for two hours in an eight-hour workday with a sit/stand option of five-to-fifteen minute increments. He could push or pull 10 pounds frequently and 20 pounds occasionally, but needed to avoid climbing. Considering Diaz's RFC and the vocational factors, the ALJ found that Diaz was not disabled prior to December 27, 2007.

## DISCUSSION

In order to be found eligible for disability benefits, Diaz needed to prove before the Commissioner that, "by reason of [a] medically determined physical or mental impairment . . . which has lasted . . . for a continuous period of not less than 12 months," 42 U.S.C. §

7

423(d)(1)(A), he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).[6]

On review, the question presented is whether the ALJ's decision that Diaz is not entitled to disability benefits is supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam). However, in deciding whether the Commissioner's conclusions on the issue of disability are supported by substantial evidence, the reviewing court

> must first satisfy [itself] that the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act. The need for this inquiry arises from the essentially non-adversarial nature of a benefits proceeding: the [Commissioner] is not represented, and the ALJ, unlike a judge in a trial, must himself affirmatively develop the record.

*Echevarria v. Sec'y of Health and Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982).

The record does not contain substantial evidence supporting the proposition that Diaz possessed the residual functional capacity found by the ALJ throughout the contested period of disability (September 2006 through December 27, 2007). The examination by Dr. Aldea cannot bear the weight the ALJ ascribes to it.[7] In *Curry v. Apfel*, 209 F.3d 117, 123 (2d

---

[6] Substantial work activity is defined as work that involves doing significant physical or mental activity. 20 C.F.R. § 404.1572. Work can be considered substantial even if it is done on a part-time basis or if less money is earned or less responsibility is associated with it than with previous employment. *Id*. Activities such as household tasks, hobbies, therapy, school attendance, club activities, or social programs are generally not considered to be substantial gainful activity. *Id*.

[7] Diaz also argues that the ALJ improperly relied on Dr. Aldea's report without admitting evidence of her medical qualifications. I disagree. The Manual on the Social Security Administration Hearings, Appeals, and Litigation Law ("HALLEX"), section I-2-1-30, does state that "[w]hen an ALJ admits a medical report, analysis, assessment or judgment by a health care professional into the record of a case . . ., the ALJ will also admit into the record a statement of the health care professional's qualifications . . . ." And it does not appear that any such statement was admitted with respect to Dr. Aldea. However, this directive is neither onerous nor absolute -- no such statement is needed when the doctor's "stationery letterhead or other document identifies his or her medical degree, specialty and Board certification." *Id.* And while the Second Circuit has not reached the issue, other circuits have held that "HALLEX has no legal force and is not binding." *Bunnell v. Barnhart*, 336 F.3d 1112, 1115 (9th Cir.

8

Cir. 2000), the court discounted the weight of a consultative examination that was "so vague as to render it useless in evaluating whether [claimant] can perform sedentary work," and found, in particular, that the doctor's "use of the terms 'moderate' and 'mild,' without additional information, does not permit the ALJ, a layperson notwithstanding her considerable and constant exposure to medical evidence, to make the necessary inference that [claimant] can perform the exertional requirements of sedentary work." Although Aldea's opinion contains some additional information, neither she nor the ALJ discuss how those observations bear on the afflictions Diaz alleges. It is unclear, for example, how Aldea could meaningfully opine on Diaz's ability to squat, climb, stand, or walk when she was unable to assess his strength across his left knee because of knee pain. Aldea does not even mention the complications caused by Diaz's steroid use. Furthermore, her examination is minimally probative of Diaz's functional capacity *after* February 23, 2007, when his condition deteriorated as his hip problems developed.

    Contrary to the ALJ's contention, some of the hospital records he cites are inconsistent with Aldea's report. For example, Diaz was hospitalized with severe sharp back pain in February 2006, and a March 22, 2006 CT scan revealed a degenerative joint disease in his spine. The remaining reports are only minimally probative. X-rays and stress tests taken in 2004 apparently revealed no abnormalities, but they were already two years old when Diaz alleges that his disability began. The records also suggest that Diaz was successfully treated for headaches, hypertension, and pneumonia during 2006, but these reports shed no light on the treatment of his kidney problems. There are progress notes from May 26, 2005 and August 18,

---

2003) (internal quotation marks omitted). Furthermore, Diaz does not contend that Aldea is not, in fact, a medical doctor, and Diaz's lawyer did not object to the admission of her report into evidence at trial. Under these circumstances, the failure to admit a statement of qualifications does not itself render the ALJ's reliance on these reports erroneous.

9

2005 stating that Diaz's nephritic syndrome was in remission. However, his condition had again deteriorated by August 9, 2006 -- shortly before Diaz stopped working altogether -- when the progress notes indicate that Diaz was once again taking steroids to treat his kidney condition.

The ALJ's summary of the hospital records contains only two reports from 2007. Diaz had an "unremarkable" x-ray of his left knee on March 17, 2007, but this sheds no light on his hip injury, kidney problems, or the side effects of his steroid treatment. A January 2, 2007 bone densitometry test of Diaz's pelvis revealed normal bone mineral density. To the extent that this test demonstrates a lack of necrosis at that time, it is consistent with Diaz's testimony that his hip problems did not begin until a few months later. And it provides no further illumination regarding the effects of Diaz's kidney condition or the medication he took to treat it.

As the foregoing demonstrates, the most probative evidence of Diaz's capacity during the relevant period was his own statement and testimony and the statements of his doctors. Both were erroneously discounted by the ALJ.

The ALJ discredited Diaz's testimony largely because the "conservative" nature of his treatment belied his claims of pain. Tr. 16. This characterization is problematic for several reasons. First, there is no indication that some more intensive course of treatment should have been pursued if Diaz's ailments were as severe as he alleged. Second, in weighing a complainant's subjective symptoms, the ALJ must consider not only the treatment received, but "any measures" used to relieve his pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(vi). The neglect of this factor is particularly significant in this case, where Diaz consistently testified that

his pain medication only helped a little, and he was forced to spend much of his day lying down to relieve his pain.

In addition, it seems odd to characterize Diaz's treatment regime as conservative in light of the fact that it involved frequent use of corticosteroids, a medication with potentially severe side effects. Indeed, Dr. Lieber's July 8, 2008 report suggests that Diaz's steroid use caused his hip necrosis. Given the state of the record, it is unclear how long he took these steroids, but I cannot agree that it was only for "a short time." Tr. 16. Diaz initially testified that he discontinued steroid use after two years. However, he later stated that he did not stop taking steroids until December 2007, the medical records cited by the ALJ indicate that he was prescribed prednisolone (a corticosteroid) on August 9, 2006 and prednisone (another corticosteroid) on December 7, 2006, and Dr. Aldea reports that Diaz was taking prednisone daily when she examined Diaz in February 2007. Thus, the record suggests that Diaz's steroid use was far more pervasive -- and his treatment was accordingly more intensive -- than the ALJ suggests. In addition, to the extent the record is ambiguous on this point, it appears that the ALJ breached his duty to develop the record. Given that Diaz claims that the side effects of his steroid use caused him to stop working, the ALJ's failure to make an effort to nail down when Diaz was actually using steroids is a serious omission.

The ALJ also discounted the statements of Dr. Lieber because they were inconsistent with the other evidence in the record and because they were inconsistent with each other. Neither ground is tenable. Dr. Lieber concluded, in June and July 2008, that Diaz's functioning was severely limited due to recently diagnosed avascular necrosis in his hip. This statement cannot be inconsistent with the other medical evidence, because it is based on a

11

diagnosis that post-dates all of that evidence.  Similarly, the inconsistencies between the two reports were inconsequential.  For example, the fact that Dr. Lieber checked the box saying that Diaz could occasionally lift "less than 10 pounds" in June, but checked the box indicating that he could lift "10 pounds" exactly in July cannot be sufficient to render inconsequential the opinion of a doctor who had treated Diaz for years.  A doctor who estimated that Diaz could lift approximately 10 pounds could reasonably check either box, and the fact that Lieber did not tick the same box consistently does not render his opinion suspect.

    The ALJ also stated that the opinions of Dr. Lieber and Cucchiarelli were not "supported by clinical findings."  Tr. 17.  I disagree.  At some point prior to the doctors' statements, as the ALJ himself found, Diaz was diagnosed with avascular necrosis.  Presumably, the diagnosis was either the result of a physical examination, laboratory tests, or some combination of the two.  Either of these would constitute a "clinical finding," 5 C.F.R. § 339.104(b).  Thus, because the doctors' statements are based on a valid diagnosis of avascular necrosis, their statements are supported by clinical findings.  Furthermore, the ALJ's doubt as to the nature of the treating relationship between Diaz and Cucchiarelli points to another failure to adequately develop the record.

    It is beyond dispute that, as of September 2006, Diaz lacked the residual functional capacity to perform his past relevant work.  The only question is whether he had sufficient capacity during the period from September 2006 to December 2007 to perform some other work.  The evidence suggesting that he did was given undue weight by the ALJ, and the evidence suggesting that he did not was erroneously discounted by him.  Accordingly, I cannot conclude that the ALJ's finding regarding Diaz's residual functional capacity was supported by

substantial evidence. Furthermore, given, *inter alia*, the ambiguity in the record regarding the frequency of Diaz's steroid use and the failure to ascertain the treating relationship between Diaz and Dr. Cucchiarelli, I find that the ALJ failed to adequately develop the evidentiary record in this case.

## CONCLUSION

For the reasons set forth above, Diaz's cross-motion for judgment on the pleadings is granted and the defendant's motion is denied. The matter is remanded to the Commissioner for further appropriate proceedings.

So ordered.

John Gleeson, U.S.D.J.

Dated: August 24, 2009
      Brooklyn, New York